UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CAROL EGE,

                    Petitioner,                              Case Number: 01-10294-BC
                                                             Honorable David M. Lawson

v.

JOAN YUKINS,

                    Respondent.
_____/

## OPINION AND ORDER CONDITIONALLY
## GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Nine years after the violent death of Cindy Thompson, the petitioner, Carol Ege, was indicted

for her murder.  Thompson and Ege were part of a love triangle that included their mutual boyfriend,

Mark Davis, whose child Thompson allegedly was carrying when she died.  The Michigan Court

of Appeals, which affirmed the petitioner's conviction and life sentence for first-degree murder,

Mich. Comp. Laws 750.316(c), on direct appeal following a jury trial in the Oakland County Circuit

Court, characterized the case as follows:

> *This is a troubling case.* The crime is horrific. The initial investigation was
> deficient. Defendant was not charged until nine years after the murder. There are
> others who are logical suspects. No one saw defendant at the scene the evening of
> the murder. No physical evidence links defendant to the crime *except testimony that
> a mark on the victim's cheek is a bite mark that is highly consistent with defendant's
> dentition. . . .*  The credibility of much of this evidence was called into question.

*People v. Ege,* 1996 WL 33359075 at *1, n.1 (emphasis added).

The evidentiary opinion describing the so-called bite mark evidence came from an expert

witness named Dr. Alan Warnick, who characterized the "match" of a mark on the victim's cheek

with the petitioner's dentition in terms of overwhelming mathematical probability.  As the post-

conviction evidence demonstrates, however, Dr. Warnick thoroughly has been cast into disrepute

as an expert witness and several convictions based on his testimony have been undermined and overturned.  This case presents another.  In ruling on the petitioner's post-conviction motion, the state trial judge agreed that the bite mark evidence and Dr. Warnick's statistical gloss on it were improperly admitted, but the state court denied relief because of the lack of a contemporaneous objection and an view that the showing of prejudice was insufficient.  This Court agrees that expert testimony identifying the petitioner as the only possible perpetrator of the alleged bite mark in the Detroit metropolitan area was improperly admitted.  However, the Court also finds that admission of the evidence and trial counsel's failure to object thereto deprived the petitioner of a fundamentally fair trial.  The state courts' contrary decisions during state collateral review constitute an unreasonable application of clearly established federal law as determined by the Supreme Court.  This Court, therefore, will issue a conditional writ of habeas corpus, allowing the State a reasonable time to retry the petitioner if it so chooses.

I.

The Michigan Court of Appeals summarized the facts of this case in its opinion on direct appeal as follows:

> In April 1993, defendant was charged by grand jury indictment with the murder of Cindy Thompson, in Pontiac, nine years earlier, in the late evening of February 21, 1984, or early morning of February 22, 1984. Thompson was bludgeoned and stabbed to death, and was found in a pool of blood in her upstairs bedroom, her organs laying beside her. Mark Davis, with whom defendant had lived since the late 1970s and still lived at the time of the murder, had been having a sexual relationship with Thompson as well as defendant. Thompson was seven months pregnant at the time of the murder. Davis testified that he found Thompson some time before 5:00 a.m. on February 22, 1984.
>
> There was testimony at trial that on February 20, 1984, Davis and three friends of his, Bob Dunn, and Cheryl Blankenberg Hooker (Blankenberg) and David Hooker, had helped move some of Thompson's things into Thompson's house and stayed there partying until very late that night. Dunn stated that he left Thompson's

-2-

around midnight and the others were still there. The next day, February 21, 1984, Thompson baby-sat until around 8:00 p.m. for the couple who lived across the street and who owned the house Thompson was living in, Barbara Lambert and Jack Segal. Thompson then went to see Lambert at her workplace, and that is when she was last seen alive, between 8:45 p.m. and 9:15 p.m. on February 21, 1984. Thompson's neighbor testified that she heard what she believed was Thompson's car pull in the driveway around 8:45 or 9:00 p.m. that night and that she heard a second car pull in shortly after, stay several minutes, and then leave. A friend of Thompson's testified that there was no answer at Thompson's number at 6:00 or 6:30 p.m. and that at about 8:00 p.m., the phone was busy and remained so until 9:00 p.m., when she stopped trying to reach Thompson. There was no sign of forced entry at Thompson's home. Rather, the back door was found unlocked. Davis and Segal had keys to the house. The phone chords had been cut. The parties agree that the initial police investigation, which continued only until April 1984, was inadequate. Years later, in 1992, the investigation was reopened by Pontiac detectives Serna and McLaurin as a result of persons coming forward with alleged evidence incriminating defendant. In June 1992, evidence collected at the murder scene in February 1984 was submitted to the Michigan State crime lab for the first time. None of the evidence submitted to the crime lab connected defendant to the crime. Rather, it yielded fingerprints of Davis and Thompson and hairs of Thompson and others, not defendant. Thompson's body was exhumed in 1993, apparently to investigate a mark on her left cheek visible in photographs taken at the murder scene, which the initial autopsy report concluded was livor mortis. The prosecution's experts opined that the mark was a bite mark consistent with defendant's dentition, while the defense experts opined it was livor mortis, and that even if it were a bite mark, it was not consistent with defendant's dentition.

The prosecution's theory of the case as presented in its opening statement was that defendant was obsessed with Mark Davis, Thompson and the child Thompson was carrying, and that defendant plotted and solicited others to kill Thompson. The prosecution said that the evidence would show that defendant had, before the murder, become violent and smashed several gifts Thompson had bought Davis, that defendant attempted to hire several people to kill Thompson, and made statements to others that Thompson would not have the baby, and that defendant and Thompson had a violent argument the day before the murder.

The defense's theory as presented in its opening statement was that defendant could not have been at the crime scene on the evening of the murder because as she was at the home all evening, and that although there was some evidence pointing to defendant, none of the many witnesses the prosecution would present at trial would say defendant committed the crime. Defense counsel stated that he would be able to show a more compelling circumstantial case against several of the prosecution's witnesses, who were suspects, and an overwhelming case against Davis. Defense counsel stated that the connections between the prosecution's witnesses were

-3-

frightening and suggest another agenda.  He stated there was no proof that Davis was the father of Thompson's baby, that this was a classic love triangle, and that defendant did not like Thompson and had made statements, as everyone has, that she would like to kill Thompson.  Defense counsel stated that he would prove that Karen Reppuhn, a witness for the prosecution, was "an absolute outright lying perjurer," along with a number of other witnesses.  Defense counsel further stated that the initial police investigation concluded that Thompson's murder was an unsolved mystery, with a lot of suspects but no hard proof as to any of them, and that the murder remained an unsolved mystery.

Defendant filed a pre-trial motion in limine to exclude evidence of prior similar acts as to two alleged prior statements of defendant regarding Thompson and two alleged incidents involving defendant and Thompson: 1) that on or about November 1983, defendant told Karen Reppuhn that she wanted to slice Thompson's throat and would pay someone to do so; 2) that in December 1983 or January 1984, defendant told Timothy Apker that she wanted Thompson dead and wanted Apker to kill Thompson; 3) that on December 13, 1983, defendant went to Thompson's sister's home, where Thompson was staying, and physically and verbally assaulted Thompson; and 4) that on February 20, 1984, defendant went to Thompson's home and argued with her on the front porch. The trial court denied defendant's motion.

At a fifteen-day trial in December 1993 and January 1994, many of the prosecution's witnesses, other than police officers and experts, were good friends of Mark Davis and the victim and were impeached on the stand with prior testimony or statements.  At the time of the murder, most of the witnesses drank heavily and used drugs.

Sergeant Steven Sitar of the Pontiac Police Department testified that on February 22, 1984 he was dispatched to 97 Seneca Street in regard to suspicious behavior.  After Sitar arrived at the house with Officer Clark, they knocked on the door and received no answer.  Officer Michael Story also arrived shortly after. About two minutes later, two vans pulled into a parking lot next door.  A man later identified as Mark Davis got out of one of the vans and approached the officers. Davis was very excited and told the officers that his girlfriend needed help; that she had been 'cut-up.' Davis fumbled with his keys and eventually produced the correct key and unlocked the front door of the house.

Dried blood was found on the bottom of the stairs as well as a clump of hair and more blood further up the stairs. In an upstairs bedroom there was a female body lying on the floor face down in a large pool of blood.  There was a large laceration starting from the middle of her spine and going around to her right side.  Sergeant Sitar said that the wound was very extensive and was gaping open and that she had been disemboweled.  He said that there was blood everywhere.

-4-

There was a vanity table overturned by the victim's feet and a telephone which had been pulled apart from the receiver. The walls inside the bedroom were also splattered with blood. Officer Story found a bloody towel in the kitchen area. There were no signs of forced entry into the home.

Mark Davis testified that he had known defendant for the majority of their lives. They began living together in the late 1970s. They lived in California for some time and then moved to Auburn Hills, Michigan. Davis testified that he had been involved in a relationship with Thompson, and Thompson became pregnant in 1983 with Davis' baby. At the time of the murder, she was seven months pregnant. Davis testified that he had intended to move out of defendant's home and move in with Thompson, that he believed defendant probably knew about Thompson, and that was not sure that he ever discussed with defendant his plans to move in with Thompson.

On February 21, 1984, Davis went out drinking with his friend, Robert Dunn, early in the day. He came home around 6:30 p.m., had something to eat and began drinking some more. He played video games at home until some time in the evening. At some point later in the evening he decided to go to Thompson's house to see how she was doing. By this time, he had drunk approximately five bottles of wine. When he arrived, Thompson's dog was on the front porch, which he said was unusual. Davis went into the house and found Thompson lying on the floor upstairs in the dark. Davis said that after he replaced a light bulb in the room and turned the light on, he saw a lot of blood and tried to feel a pulse. Davis claimed that he tried to grab the telephone but that the line had been cut. He decided to go to his friends' house which was 4-1/2 miles away and get help. He drove there quickly without stopping.

Davis drove to Cheryl Blankenberg's and David Hooker's house. Blakenberg testified that Davis arrived at 5:00 a.m., was very upset, and said that there was something wrong with Thompson – that there was a lot of blood, and asked Blankenberg to call the police and an ambulance. They made the call and followed Davis back to Thompson's house in their van. The police had already arrived by the time they got there and checked them for traces of blood. Davis testified that he let the police into the house with his key and waited while the officers conducted their investigation. Later, the officers took all three in for interviews. At trial, Davis testified that he did not kill Thompson and that her murder had ruined his life. On cross-examination, he testified that he never believed that defendant killed Thompson. He also reaffirmed that defendant was home all night.

Blankenberg testified that she had not been satisfied with the progress of the investigation, that she discovered after the murder that a woman named Sheila Walker had witnessed a man and a woman arguing with Thompson on her porch, that seven weeks after the murder, Blankenberg showed photographs to Walker of different people in an attempt to ascertain who they were, that Walker identified

defendant as the woman that she had witnessed arguing with Thompson on her porch, that Walker identified Davis as someone who might have been the man who was with defendant, and that Blankenberg gave this information to Detective Jarvis.

Walker testified at trial regarding the incident. She testified she did not know defendant, Thompson or Davis. She saw a man and a woman on the porch arguing with someone in the doorway, who sounded like a woman. The woman on the porch had long, sandy-blonde hair and was very thin. She called the other woman a "lying bitch," said she wanted to "stomp her ass" and "kick her ass," and said "you're going to pay." She also heard discussion regarding whether the man was the father of a baby. In 1992, Walker identified defendant from photographs shown to her by Detectives Serna and McLaurin. She was quite definite regarding this identification. She picked out one photograph of defendant, but not another. At trial, Walker could not say that defendant was the woman she had seen on the porch. Nor could she do so at the preliminary examination. She did not know why the record of her report to police at the time did not state that the woman had blonde hair. She had no recollection of meeting with Blankenberg or being shown photographs by her.

Barbara Lambert testified that she had previously lived in an apartment across the hall from Thompson. In late 1982, Thompson was in Lambert's apartment and they heard a lot of commotion coming from Thompson's apartment. They walked across the hall and saw that defendant was in Thompson's apartment destroying some of Thompson's T-shirts. Thompson and Lambert confronted defendant, who was very angry with Thompson because Thompson wanted Davis to move in with her. Defendant told Thompson that she would never have Davis. At the time of the murder, Thompson was living in a house owned by Lambert and her ex-husband, Jack Segal. She did not pay rent, but baby-sat for Lambert's children. Segal had a key to Thompson's apartment, did not like Thompson much, though he could be getting rent if Thompson did not live there, and failed to convey information to the police that Lambert had relayed to him for that purpose. Segal was an ex-Pontiac police officer.

Debra Dunn testified that she went with defendant to Thompson's apartment sometime in 1981 or 1982. Defendant was angry because Thompson had purchased some T-shirts and a watch case for Davis for his birthday. Defendant went to Thompson's apartment and tore the T-shirts with her hands. Dunn claimed that after Thompson became pregnant, defendant said to her that "Cindy was not going to have the baby; that she didn't know how or why, and she didn't want to get me involved, but that she wasn't going to have the baby."

Shirley Howells, Thompson's sister, testified that Thompson had lived with her shortly before Thompson moved to Seneca Street. On December 13, 1983, Howells was in the basement of her house talking on the telephone. Thompson had taken Howells' daughter to the corner store. Howells said that she began having

-6-

trouble with her telephone connection and also heard a knock on her back door. Howells went upstairs and looked out and saw a blonde woman. Howells opened the door and the woman told her that her name was Lisa, and said that she was a friend of Thompson's. The woman left when Howells told her that Thompson was not there. When Thompson came back, Howells told her about the visitor. Thompson said that she did not have a friend named Lisa and that she thought that it had been defendant. Subsequently, the woman knocked on the door again. Thompson and Howells went to the door. Thompson looked out and said that it was defendant. Howells opened the door and told defendant that Thompson did not want to talk to her and that she should leave. Defendant would not leave and eventually forced her way into the house. Howells took her by the shoulders and tried to push her back out the door. A man suddenly came in from outside, shoved Howells and told her to let go of defendant. Defendant grabbed Thompson and they struggled. Thompson was five months pregnant at the time. Thompson yelled for someone to call the police. The man yelled for defendant to get out of there and they left.

Thompson told her that while Thompson and defendant were struggling, defendant told her that she had better stay away from Davis. Thompson had three or four long scratches on her back. When the police arrived, they determined that Howells' old telephone wires had been tampered with. Howells later told Thompson that she would have to either stay away from Davis or move out of her home.

Lieutenant Wojnaroski interviewed defendant on the morning of February 23, 1984. Wojnaroski testified that at the conclusion of the interview he told defendant that he felt that she was not telling the truth. He said that he asked her whether the information she was withholding had anything to do with her relationship with Davis and Thompson and Thompson's death and she replied: "probably."

Carol Parker testified that she had been living with defendant for about one week prior to the murder. She recalled that defendant frequently expressed that she wanted to have Thompson killed. Defendant told Parker that she could live with her for free as long as she would be her alibi. Defendant told her that she believed Thompson's baby would be deformed in some way and that killing Thompson would be doing Davis a favor. Parker said that defendant was searching for someone to kill Thompson and that defendant had asked Richard Lingnau and Timothy Apker if they would do it. Defendant also discussed it with Thompson's cousin, Bobby Thompson. However, Parker was not present when defendant offered anyone money to kill Thompson. Defendant told Parker that she had gone to Thompson's home and tried to cause her to lose the baby by arguing with her and trying to push her down the stairs. Parker testified that she was with defendant when she said she was going to the bank to withdraw money to use to pay someone to kill Thompson. She did not see the cash. When they got home later, defendant tore up her bank book and put it in the bottom of a milk carton which she threw in a dumpster. Detective Serna later

testified that he tried to follow up on Parker's account of having gone to the bank with defendant, but could not find the bank or any records.

After Thompson was murdered, Parker went with defendant to the police station. Defendant told Parker to say that she had been with her all night. However, Parker had been working at McDonald's until about 3:00 a.m. Initially, Parker told the police that she did not know anything but that defendant was home, sleeping, when she got home from work[.] Parker wore a wire for the police in 1992 and meet [sic] with defendant. Defendant did not confess during that meeting.

Timothy Apker, Carol Parker's ex-husband, testified that defendant spoke with him on several occasions about hiring someone to kill Thompson. Apker said that the first time she mentioned it to him was after a party. She asked him to go to a Taco Bell restaurant where defendant asked him if he was interested in killing Thompson for money or if he knew of anyone who would be. Apker claimed that defendant wanted Thompson dead because of the baby and because of the potential charges that Thompson would file against her. Defendant said that she would pay between $350 and $500. Apker said that defendant contacted him several times after that to find out if he had found anyone to kill Thompson. Apker claimed that he was trying to ignore her and that he did not accept her offer. After Thompson's death, Apker contacted the police in order to tell them what he knew. Apker participated in the investigation by wearing a wire and talking to defendant.

On cross-examination, Apker admitted that he did not like defendant, that Nancy Davis, Davis' mother, did not like Thompson and expressed her desire to see Thompson killed, that when he first spoke to detectives he could not remember whether defendant or his ex-wife contacted him about killing Thompson, and that he had told police that he could not remember whether he and defendant went to a Taco Bell.

The Oakland County Chief Medical Examiner, Dr. Ljubisa Dragovic, testified that when he reviewed Thompson's autopsy records, he found that some of the important features and findings within the photographs were omitted from the report. He suggested to the prosecutor's office that the body be exhumed for further examination, and it was in April 1993. The original report mentioned the stab wounds caused by a sharp instrument but not the injuries to the head and hands caused by a blunt instrument. After his examination, he determined that Thompson had received sharp force injuries to the chest and neck. One of the cuts to the neck also severed the spinal cord. She also received blunt force injuries to her face and head. These injuries were likely to have been caused by a hammer. The abdominal organs were protruding out of a gaping slash of the right side of the abdomen. The seven-month-old fetus had not been injured but it died along with the victim. Thompson's left arm had superficial cuts. Her right hand had been cut with a sharp instrument. Both hands had multiple bruises. Dr. Dragovic characterized

-8-

Thompson's injuries to her hands as defensive injuries. The cause of death was characterized as multiple sharp and blunt force injuries. It was likely that a person who inflicted the injuries would have been splattered with blood.

Dr. Dragovic also discovered a blunt force injury to the left cheek which caused him to request the aid of a forensic odontologist. This expert, Dr. Alan Warnick, opined that the injury was a bite mark. Dr. Warnick compared dental impressions and chartings ('dentitions') of Apker, Davis, Lingnau, Bobby Thompson, Troy Collings and Jack Segal and found that none of them could have made the bite mark. He also checked defendant's dentition and concluded that it was highly consistent with the bite mark. Dr. Warnick opined that the mark was made by defendant.[1] On cross-examination, Dr. Warnick conceded that since the victim was found lying on her left side, face down on her left cheek, an oval mark, possibly a "pseudo bite mark," could have been impressed on her face.

Karen Reppuhn, Cheryl Blankenberg's sister, testified that she and a girlfriend of hers, Debbie Shelby, met defendant once at the Back Seat Saloon during deer hunting season in 1983. Reppuhn was at the saloon to "party" and was drinking Tequila Sunrises. Kim Davis, a friend Debbie Shelby's came in the bar. Kim and Debbie introduced Reppuhn to defendant, and they all sat down at a table. Tim Apker, a bouncer there, occasionally came by to talk. Reppuhn testified that she and defendant discussed their respective boyfriends, and that defendant talked about Mark Davis, and told Reppuhn that she hated Cindy Thompson, that Thompson had gotten pregnant to trap Mark, that the baby was not going to be right, and that Thompson should have an abortion. Defendant told Reppuhn that she could stomp the baby out of her, slit her throat, rip her up in little pieces and think nothing of it, that Thompson was a parasite and deserved to die. Reppuhn said that she did not like Thompson either, and said a lot of nasty things about Thompson, and that she and her sister, Cheryl, never got along. Reppuhn testified that she advised defendant not to do it herself, and defendant said she would not do it herself, she would hire someone,

---

[1]The trial record discloses that Dr. Warnick opined that the alleged bite mark was "highly consistent with the dentition of Carol Ege." Trial Transcript ("Tr.") Volume ("Vol.") VIII at 42. The questioning by the prosecutor then continued as follows:

Q:   Okay. With regard to – let me ask you a question. Let's say you have the Detroit Metropolitan Area, three, three and a half million people. Would anybody else within that kind of number match like she did?

A:   No, in my expert opinion, nobody else would match up.

*Ibid.*

and asked Reppuhn how much it would cost and whether she knew anyone who would do that.  Reppuhn suggested Apker.

Reppuhn further testified that after she heard about the murder she thought that her "sister's friends were a bunch of kooks anyway," and Reppuhn "didn't want anybody to know" about the conversation because she was just starting a relationship and it was too embarassing to "tell somebody that you sat in a bar and was stupid enough to talk about killing somebody."  She eventually told her mother about the saloon incident and spoke to detectives Serna and McLaurin in October 1992, after the case was reopened.

On cross-examination, Reppuhn testified that Debbie Shelby did not remember that evening at the saloon.  She was impeached with earlier testimony that she was not sure who brought up the subject of hiring someone to kill Thompson. Reppuhn testified that she was not an alcoholic back then, but was at the time of trial. She testified that she probably told her sister, Blankenberg, about the conversation the following summer, 1984.  She testified that she did not know whether defendant had been drinking that night but that "she wasn't doing no shots with me.  That's for sure."  She admitted testifying previously that she did not think defendant had been serious, that she was blowing off steam or making a joke.

Kim Davis denied being at the bar anytime after 1980.  Blankenberg denied that Reppuhn told her that defendant was the person she met in a bar.  Blankenberg did not mention Reppuhn to police in 1984.  Apker denied being solicited by defendant in Reppuhn's presence.  Many witnesses testified that the Back Seat Saloon ceased doing business in October 1982.

Richard Lingnau testified he had known defendant since 1975, when she was a neighbor.  He dated her for about two years, about 1980-81.  He testified that he met Cindy Thompson only once, and that defendant never discussed with him her relationship with Davis and Thompson.  Lingnau then testified that defendant wanted Thompson "really hurt bad, either beat her up bad or kill her."  He considered doing it, and defendant offered $ 200-300.  Lingnau was unaware Thompson was pregnant. On December 13, 1983, he went to Thompson's house with defendant.  He said his intent was to kill Thompson.  Lingnau shoved Thompson's sister and told her to go upstairs, and Thompson ran downstairs and was presumably calling the police. Lingnau said to defendant they should get out of there, and he cut what he thought were phone wires.  Lingnau testified that because there were witnesses there, he decided not to do anything.  Lingnau later called defendant and told her to forget it, because he was thinking of the consequences.

On cross-examination, Lingnau testified that he considered himself an honest person.  He was hurt when defendant broke off their relationship, he believed her a kind and gentle person and, other than this incident, never knew her to want to harm

-10-

anyone.  In late 1983 and early 1984 he averaged about ten beers a day.  Shortly
before December 13, 1983, he was institutionalized 26 days in Clinton Valley
beginning October 30, 1983, due to having a police stand-off in his neighborhood.
He denied being hospitalized through December 12, 1983.  He was impeached with
previous testimony regarding dates, and with having told detectives Serna and
McLaurin that defendant did not offer him money, and that defendant never said she
wanted Thompson killed, she just wanted to hurt her.  He admitted not having taken
a weapon with him to Thompson's.  Lingnau testified that Thompson first grabbed
defendant's hair and that that made him mad, and that defendant had not been doing
anything, except saying that she wanted to talk to Thompson.  He denied that
defendant ever pushed anyone or hit anyone.

Additional prosecution witnesses testified.  Defendant's statement to police
in April 1993 was presented to the jury.  In it, she made several assertions that were
contradicted by the evidence at trial, including that Lingnau did not accompany her
to Howells' house in December, 1983.

Defendant called Dr. Werner Spitz, a pathology professor at Wayne State
University, and pathologist for Macomb and Monroe counties.  At defense counsel's
request, Dr. Spitz reviewed the two autopsy reports and photographs in connection
with this case.  He did not believe that Thompson's head injuries were caused by a
knife with a bent tip, rather by a blunt object.  Regarding the alleged bite mark on
Thompson's left cheek area, he concluded it was livor mortis, also known as
post-mortem lividity, and not a bite-mark.  He discussed the case with Dr. Sopher,
a forensic pathologist and dentist, and read Dr. Warnick's trial testimony.

Dr. Irvin Sopher, a dentist and medical doctor, testified at length about bite
marks, and opined the mark on Thompson's cheek was livor mortis and not a bite
mark, and even if it were a bite-mark, the pattern did not align with defendant's
dentition or bite.

Elwood Webb of the Michigan Liquor Control Commission testified that the
Back Seat Saloon ceased doing business sometime prior to October 1982, when the
license became inactive, and that the license never became active again.

Ronald Crichton of the Oxford police department testified that the Back Seat
Saloon ceased to exist around 1980 or 1981 and became known as The Way Station,
which went out of business sometime in 1982. Another witness brought a copy of a
foreclosure on the property dated September 1982.

Defendant testified that she had known Mark Davis since they were small
children.  They began dating in 1978, five years after graduating from high school.
Defendant said that she did not realize that Davis was also seeing Thompson in a
romantic way until December 1982 when Thompson gave Davis some birthday

presents. She said that Davis ripped up the shirts because they were too small and then she returned them to Thompson's apartment. She testified that she told Thompson to leave Davis alone and Thompson told her to leave her apartment. Defendant described attending a party that Thompson was also at where they did not have any unpleasant interactions. Defendant learned in the fall of 1983 that Thompson was pregnant with Davis' child. She said that she had been angry and hurt.

Defendant denied ever approaching Apker and asking him to go to a Taco Bell. She said that she never asked him to kill Thompson or to find someone to do it.

Defendant testified that she did go to Howells' home to talk to Thompson. She was frustrated with the situation with Davis and wanted to find out if Thompson knew what Davis was going to do. Defendant denied ever having planned to kill or hurt Thompson. She claimed that when Howells would not let her in the door, she pushed it open because she really wanted to talk to Thompson. She said that she did not push Thompson down the stairs.

Defendant denied asking Carol Parker to be her alibi or to lie to the police for her. Defendant said that she did not visit Thompson's house on February 20, 1984. She testified that on the evening of February 21, 1984, she and Davis had dinner together at their house. After dinner, Davis started to play video games and she went to bed around 11:00 p.m. Defendant recalled that Parker came home later that night. At some point in the middle of the night, Davis came in and told defendant that he was leaving to go to Thompson's. The next morning, Parker called defendant at work and told her to come home because Davis was very upset because he had found Thompson dead. Defendant said that she was shocked.

*People v. Ege,* 1996 WL 33359075 at *1-9.

The jury found the petitioner guilty of first-degree murder on January 12, 1994. On January 28, 1994, she was sentenced to life imprisonment without possibility of parole. The petitioner filed a direct appeal presenting the following claims:

I.   The trial court erred in allowing the introduction of defendant's custodial statements to police officers at the Cape Coral, Florida Police Department, which statements were taken without *Miranda* warnings.

II.  The trial court erred in allowing into evidence prior bad acts and threats allegedly made by defendant against the decedent.

-12-

III.    The trial court erred in allowing the jury to hear irrelevant, prejudicial, and highly inflammatory testimony regarding defendant and defendant's expert witness.

The Michigan Court of Appeals affirmed the petitioner's convictions and sentences. *People v. Ege*, 1996 WL 33359075 (Mich. App.), No. 173448 (Mich. Ct. App. September 17, 1996).

The petitioner then filed a delayed application for leave to appeal to the Michigan Supreme Court, presenting the same claims presented on direct review to the Michigan Court of Appeals, as well as the following two claims:

I.    The trial court committed reversible error by allowing the prosecution, in its case in chief, to present a statement made by defendant during custodial interrogation, which statement was not preceded by *Miranda* warnings.

II.    A new trial is mandated by the fact that the trial prosecutor inquired of defendant whether it was true that she had twice been impregnated by prosecution witnesses, and that she had subsequently ended those pregnancies by abortions.

The Michigan Supreme Court denied leave to appeal. *People v. Ege*, 456 Mich. 911, 572 N.W.2d 658 (Table). No. 108667 (Mich. Sup. Ct. December 30, 1997).

The petitioner's conviction became final on March 30, 1998, ninety days after the Michigan Supreme Court denied her application for leave to appeal. 28 U.S.C. § 2244(d)(1)(A); Sup. Ct. R. 13(1); *Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517 (1977); *see also Bronaugh v. Ohio*, 235 F.3d 280, 283-85 (6th Cir. 2000) (holding that the state court direct appeal is final for purposes of habeas corpus statute of limitations  when the ninety day time period for filing a petition for writ of certiorari in the United States Supreme Court has expired).

On July 28, 1999, the petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, a motion to expand the record, and a motion for an evidentiary hearing in the Oakland County, Michigan circuit court.   The petitioner argued in her post-conviction motions that

-13-

her due process right was violated by the admission of the Dr. Warnick's opinion testimony matching up the bite mark evidence because it was scientifically unsound and the expert had a demonstrated record of unreliability.  The state trial judge filed an opinion on January 11, 2000 – the last reasoned opinion from the state courts in the case – finding that the evidence, particularly the testimony concerning the mathematical probability of an alternate random match, "lacked the proper foundation."  Trial Ct. Op. at 5 (Jan. 11, 2000).  However, the court denied relief because trial counsel failed to object to the evidence and the court believed the opportunity to present evidence challenging the expert's methodology removed any prejudice resulting from receipt of the inadmissible evidence.  The court weighed the improper evidence against "the strength of the untainted evidence" and found that a new trial was not required.  *Id.* at 6.  The petitioner also argued that her trial attorney was constitutionally ineffective, depriving her of her Sixth Amendment right to counsel, because he failed to object to the bite mark evidence and other testimony concerning the petitioner's sexual history.  The state trial judge denied relief on that ground because he found that trial counsel's performance was not substandard.  The trial judge denied a motion for reconsideration on February 15, 2000.  The state court of appeals denied the petitioner's delayed application for leave to appeal on August 24, 2000 in a form order.  The state supreme court did the same on April 30, 2001.  *People v. Ege*, 627 N.W.2d 597 (Mich. 2001).

Thereafter, on August 13, 2001, the petitioner filed the present petition for a writ of habeas corpus presenting the following claims:

I.     Petitioner was denied  a fundamentally fair trial in violation of due process of law through the admission of an erroneous expert opinion that there was a "3.1 million to one chance" that a bite mark on the victim's body was made by anyone other than the petitioner, where this opinion was without scientific foundation and where subsequent cases have shown this particular expert to

be completely unreliable with a series of demonstrably erroneous bite mark identifications in capital cases.

II.  Petitioner was denied the effective assistance of trial counsel where counsel failed to object to a series of obviously inadmissible and inflammatory prosecutorial questions posed to the testifying defendant about her sexual history, and her history of multiple abortions, and where counsel failed to demand a *Davis-Frye* hearing as to expert testimony given by Dr. Warnick and denied the effective assistance of appellate counsel where counsel, who represented petitioner both at trial and on appeal, failed to raise the issue of his own ineffectiveness at trial on appeal.

III.  Petitioner's constitutional rights were violated where she was confronted by the prosecution at trial with questions regarding her sexual history and the fact that she had two abortions.

The respondent filed a motion to dismiss the petition asserting that it was filed out of time and thus barred by the statute of limitations.  On June 4, 2002, this Court entered an order denying the respondent's motion because it was satisfied that "that discovery of non-record facts relating to the unreliability of the state's witness did not occur and could not have occurred until" after the expiration of the habeas filing deadline, even as tolled by the petitioner's state post-conviction motion.  The Court now turns to the merits of the case.

II.

Although the petitioner's trial occurred in 1994, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), govern this case because the petitioner filed this habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  That Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

-15-

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law.  *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  As discussed more fully below, mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S.362, 409 (2000) (internal quotes omitted)).   Additionally, this Court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The petitioner in this case does not contend that the state trial judge's denial of her post-conviction motion seeking a new trial was "contrary to" established Supreme Court precedent.  Rather, she insists that the failure to allow a new trial in the face of acknowledged improperly-admitted expert evidence of bite marks and the bogus probability analysis offered by the State's

-16-

expert was an unreasonable application of federal law established by the Supreme Court.  Under the "unreasonable application" prong, "'a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Williams*, 529 U.S. at 413).  Put another way, "a federal court may grant habeas relief [under this prong] based on an application of a governing legal principle to a set of facts different from those of the case in which the principle was announced."  *Id.* (citing *Williams*, 529 U.S. at 407).  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634 (2003) (alteration in *Price*) (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).  Rather, "[i]n order for a federal court to find a state court's application 'unreasonable,' the state court's decision must have been more than incorrect or erroneous[;][it] must have been 'objectively unreasonable.'"  *Wiggins*, 539 U.S. at 520 (citing *Lockyer*, 538 U.S. at 76); *Williams*, 529 U.S. at 409); *see also Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

## A.

The petitioner contends that Dr. Warnick's testimony was improperly admitted into evidence and, as a result, she was deprived of a fundamentally fair trial.  Dr. Warnick was permitted to testify that a mark found in a photograph of the corpse was made by a human bite, and the mark matched the petitioner's tooth pattern.  He said that out of the 3.5 million people residing in the Detroit metropolitan area, the defendant was the only one whose dentition could match the individual who left the possible bite mark on the victim's cheek.  This testimony, the petitioner argues, was

-17-

improperly admitted because it lacked scientific foundation, and the statistical probability that the petitioner bit the victim had an exaggerated impact on the jury because it was presented in form of unfounded expert testimony.

The Sixth Circuit has long recognized that "'States have broad authority to promulgate rules that exclude [or admit] evidence so long as they are not arbitrary or disproportionate to purposes they are designed to serve.'" *Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Questions concerning the admissibility of evidence in state criminal proceedings, therefore, generally are not cognizable on federal habeas corpus review unless the admission of such evidence is so egregious that the petitioner was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). As the Supreme Court "has reemphasize[d] . . . it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991). Absent a constitutional violation, a habeas petitioner challenging the admission of evidence does not state a claim upon which relief can be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir. 1994). Following the Supreme Court's decision in *Chambers v. Mississippi,* 410 U.S. 284 (1973), the Sixth Circuit adopted a series of factors to guide courts in determining whether the admission or exclusion of evidence has abridged a criminal defendant's fundamental due process rights. On habeas review, the district court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears

"persuasive assurances of trustworthiness." *Turpin*, 26 F.3d 1392, 1396 (6th Cir. 1994) (quoting

*Chambers v. Mississippi,* 410 U.S. 284, 297 and 302 (1973)).  The Sixth Circuit also has stated:

> Habeas review does not encompass state court rulings on the admission of evidence
> unless there is a constitutional violation.  *Fuson v. Jago*, 773 F.2d 55, 59 (6th
> Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3334, 92 L.Ed.2d 739 (1986).  We
> must evaluate whether the error 'had substantial and injurious effect or influence in
> determining the jury's verdict.'  *Brecht v. Abrahamson*, 507 U.S. at ___, 113 S.Ct.
> at 1722.  The petitioner must establish 'actual prejudice'  to warrant habeas relief.
> *Brecht v. Abrahamson,* 507 U.S. at ___, 113 S.Ct. at 1722.

*Clemmons v. Sowders,* 34 F.3d 352, 247-58 (6th Cir. 1994).  In *Brown v. O'Dea*, 227 F.3d 642 (6th

Cir. 2000), the Sixth Circuit articulated the test in terms of the effect of the evidence on the

resolution of a disputed issue: "Whether the admission of prejudicial evidence constitutes a denial

of fundamental fairness turns upon 'whether the evidence is "material in the sense of a crucial,

critical highly significant factor."' *Id.* at 645 (quoting *Leverett v. Spears*, 877 F.2d 921, 925 (11th

Cir. 1989). If a federal habeas court is left with "grave doubt" whether the erroneous admission of

evidence had "a substantial and injurious effect or influence in determining the jury's verdict" then

"the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

Dr. Warnick testified as follows regarding the probability that the petitioner made the alleged

bite mark found on the victim's cheek:

> Q:    Now, Doctor, with regard to your testimony, you indicated that it's highly
>       consistent with the dentition of Defendant Carol Ege; is that correct?
>
> A:    Yes.
>
> Q:    Okay.  With regard to—let me ask you a question.  Let's say you have the
>       Detroit Metropolitan Area, three, three and a half million people.   Would
>       anybody else within that kind of number match like she did?
>
> A:    No, in my expert opinion, nobody else would match up.

Trial Transcript ("Tr.") Volume ("Vol.") VIII at 42.

Dr. Warnick also testified that his comparisons of the non-dental forensic photo of the possible bite mark and dental molds taken from other, potential suspects excluded them as having made the bite mark.   These molds, like the mold of the petitioner's teeth, were made some nine years after the wound was inflicted.

There is no question that the evidence in the case was unreliable and not worthy of consideration by a jury.   Other state courts have held that bite mark evidence of this nature is not sufficient to establish guilt.   *See Jackson v. State*, 511 So. 2d 1047 (Fla. Ct. App. 1987); *People v. Queen*, 130 Ill. App. 3d 523, 474 N.E.2d 786 (1985).   One federal court has declined to issue the writ in a case that included the presentation of bite mark analysis by the State, *see Milone v. Camp*, 22 F.3d 693 (7th Cir. 1994), but the main question presented was whether the standard of admissibility announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applied to the States, which it obviously did not.   In this case, the petitioner presented evidence that Dr. Warnick's evidence has been discredited in other courts, such as the case of *People of the State of Michigan v. Anthony Otero*, Detroit Recorder's Court No. 94-13624, a rape-murder case, in which Dr. Warnick, explaining his opinion that Otero had made the bite mark found on the victim, opined that upon finding five unique points of identity between a bite mark and the suspect's teeth, the chances of someone else having made the mark would be 4.1 billion to one.   Mr. Otero was subsequently exonerated when DNA from semen found in the victim's body was shown to be from someone other than Mr. Otero and the prosecution dismissed its case against him.   Petitioner's Br. at 24-25.   Additional evidence of the unreliability of Dr. Warnick's opinion testimony is found in the letter of Richard J. Padzieski, Chief of Operations of the Office of the Wayne County Prosecuting Attorney, dated June 19, 1995, of which the petitioner became aware some time after

April of 1999.  In his letter, Mr. Padzieski states that "the Office of the Wayne County Prosecuting Attorney will not approve warrants where the main evidence as to identity of a potential defendant is the opinion of Dr. Warnick that he/she is the source of the bite marks."

Unlike *Milone*, however, the question of admissibility of Dr. Warnick's testimony is not at issue here.  The State trial judge already decided that question in favor of the petitioner at the post-conviction motion hearing, writing:

> The defendant argues primarily that she was denied a fair trial by the testimony of the prosecution's expert matching her teeth to the mark on the victim's face.  The defendant argues that bite mark testimony is scientifically unsound and that this expert has developed a track record indicating that his testimony should be subject to heightened scrutiny.  The defendant particularly challenges the scientific basis for the expert's opinion that no one in the 3.5 million Detroit metropolitan population could match the mark like the defendant did.
>
> This Court agrees that the testimony regarding the probability that the bite matched the defendant lacked a proper foundation.  Expert forensic testimony regarding identification of the defendant based upon a statistical analysis requires a proper foundation.  *People v. Adams*, 195 Mich. App. 267, 272 (1992).  To make a statistical evaluation it is necessary to know the frequency of a particular characteristic in the population. The probability of any combination of known characteristics is equal to the product of the frequency of each.  *Id.*  In this case there was no evidence offered to support the expert's conclusion regarding the probability that the defendant made the mark.  In other words, the expert did not testify that he had identified particular features of the bite mark that had a known rate of occurrence.  Neither did the expert did [sic] testify that he had multiplied these values to reach his conclusion.

*People v. Ege*, Oakland County Circuit Case No. 93-125655-FC, Opinion (January 11, 2000) at 4-5.

In this case, the state court of appeals was not asked to assess the strength of the prosecution's case against the claim of unfair prejudice resulting from the State's expert witness.  However, the court of appeals observed that the initial police work was poor and the investigation was deficient, and the State's presentation consisted of a paucity of physical evidence connecting the petitioner to the crime – that is, consisting only of the disputed bite mark evidence – and a

-21-

considerable volume of evidence of the petitioner's animosity toward the victim. *People v. Ege,*
1996 WL 33359075 at *1, n.1. The only reasoned decision considering the effect of this
erroneously-admitted evidence on the fundamental fairness of the proceedings was the trial court,
who, as noted earlier, determined that the error claim was barred by counsel's failure to object, and
the prejudice that resulted by its admission was not great enough to warrant relief.

The respondent in this case has not raised the issue of procedural default in defense against
the petition. However, since it was the primary reason for the State trial judge's denial of a new
trial, the Court shall address the question now.

1.

The failure to lodge a contemporaneous objection can constitute an adequate and
independent state law ground that insulates a federal claim from review on the merits by a federal
court. Habeas relief may be precluded on claims that a petitioner has not presented to the state
courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72 (1977);
*Couch v. Jabe*, 951 F.2d 94 (6th Cir. 1991). The doctrine of procedural default provides:

> In all cases in which a state prisoner has defaulted his federal claims in state court
> pursuant to an independent and adequate state procedural rule, federal habeas review
> of the claims is barred unless the prisoner can demonstrate cause for the default and
> actual prejudice as a result of the alleged violation of federal law, or demonstrate that
> failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner fails
to comply with a state procedural rule that required him to have done something at trial to preserve
his claimed error for appellate review, e.g., to make a contemporaneous objection, or raise a claim
on direct appeal. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94
F.3d 199, 202 (6th Cir. 1996). Application of the cause and prejudice test may be excused if a

-22-

petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *see Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Dretke v. Haley*, 541 U.S. 386 (2004).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001); *see also Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground[] only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar." *Simpson*, 94 F.3d at 202. Whether the independent state ground is adequate to support the judgment is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

If the last state court from which the petitioner sought review affirmed the conviction both on the merits and, alternatively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *Rust*, 17 F.3d at 161. If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

-23-

The last state court to have issued a reasoned opinion was the trial court, which denied the motion for post-conviction relief. As noted earlier, the state judge invoked a procedural rule – the failure of trial counsel to object at trial to the testimony of Dr. Warnick – as a ground for denial of a new trial. The contemporaneous-objection rule was firmly established and frequently followed before the petitioner's 1994 trial, at least with respect to challenges to the admission of evidence. *See, e.g., People v. Buckey*, 424 Mich. 1, 17-18, 378 N.W.2d 432, 440 (1985). In such cases, habeas review is foreclosed absent a showing of cause and prejudice.

a.

In this case, the petitioner presents ineffective assistance of counsel as cause for her procedural default. The Supreme Court has held that "cause" under the cause-and-prejudice standard must be "something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. The Court further held that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error'. . . . Attorney error that constitutes ineffective assistance of counsel is cause, however." *Id.* at 753-54 (internal citations omitted).

Ineffective assistance of counsel, therefore, is "cause" for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Thus, "[i]f [the petitioner] can show that he received ineffective assistance of . . . counsel that rose to the level of a violation of his Sixth Amendment rights, it would excuse his procedural default." *Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir. 2003). Of course, under *Edwards v. Carpenter*, 529 U.S. 446 (2000), a claim of ineffective assistance of counsel may not provide cause for a procedural default if the claim itself has been procedurally defaulted. *See id.*

-24-

at 453.  However, the petitioner raised that issue in that state court and obtained a ruling on the merits when the state trial judge determined that trial counsel was not ineffective in dealing with the bite mark evidence.

To prevail on a claim of ineffective assistance of counsel, the petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Carpenter v. Mohr*, 163 F.3d 938, 946 (6th Cir. 1998), *reversed on other grounds sub nom Edwards v. Carpenter*, 529 U.S. 446 (2000).  The deficient-performance prong of this test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The prejudice prong of the test requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

i.

The state trial judge never addressed the question of trial counsel's performance concerning the failure to object to Dr. Warnick's testimony and whether this failure constituted substandard performance.  The trial judge did remark in the initial opinion denying the post-conviction motion that

> it was the defendant's trial strategy to challenge the expert's opinion that the mark was a bite mark, and to attack the methodology by which he compared the photograph of the bite mark to the models he had obtained.  It was not part of the defendant's strategy to concede the validity of the expert's forensic opinion but attack his statistical analysis of the probability that another person might have made a similar mark.  Because the defendant was able to present credible and strong testimony that the mark was not a bite mark, the expert's probability testimony was not unduly prejudicial.

-25-

*People v. Ege*, Oakland County Circuit Case No. 93-125655-FC, Opinion (January 11, 2000) at 4-5.

The judge also observed in his order denying reconsideration that "[c]ounsel was well prepared to

challenge the opposing expert opinion that the mark on the face of the deceased was a bite mark.

Counsel's performance was not objectively unreasonable." *People v. Ege*, Oakland County Circuit

Case No. 93-125655-FC, Opinion and Order Denying Reconsideration (February 15, 2000) at 2.

There is no discussion by the State courts, however, of whether failing to object to the bite mark and

statistical evidence in the first place constituted ineffective assistance of counsel.

As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are

afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy for a court, examining counsel's
> defense after it has proved unsuccessful, to conclude that a particular act or omission
> of counsel was unreasonable. A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time. Because of the difficulties inherent
> in making the evaluation, a court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the circumstances, the
> challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotes and citations omitted). The Court has "declined to

articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the

proper measure of attorney performance remains simply reasonableness under prevailing

professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688; internal quotes

omitted). However, "errors of tactics or omission do not necessarily mean that counsel has

functioned in a constitutionally deficient manner." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir.

2001).

-26-

On the other hand, strategic decisions – if the failure to object at all to the admission of the tainted evidence could be characterized as such – made after incomplete investigations are not entitled to deference.  In *Wiggins*, 539 U.S. at 527-28, a death penalty case, the Supreme Court held that the state court of appeals unreasonably applied *Strickland*'s governing principles in rejecting the petitioner's ineffective assistance claim because the state court of appeals' conclusion that counsel's performance was within professional norms was objectively unreasonable.  Counsel did not present evidence at the penalty phase on the petitioner's personal background – a valid strategic choice under some circumstances – but counsel had failed to make a reasonable investigation into the petitioner's social history.  *Ibid.* (noting that under *Strickland*, "strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation") (citation and internal quotation marks omitted).  This failure to reasonably investigate, in turn, rendered the state court's deference to counsel's strategic decision not to present mitigating evidence of the petitioner's social history objectively unreasonable as well.  *Wiggins*, 539 U.S. at 527-28 (stating that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

In this case, it is difficult to conceive of a reason for not objecting to the bite mark evidence and the statistical opinion.  As the state court of appeals observed in its opinion on direct appeal, "[t]he defense's theory as presented in its opening statement was that defendant could not have been at the crime scene on the evening of the murder because as she was at the home all evening," and "[n]one of the evidence submitted to the crime lab connected defendant to the crime."  *People v. Ege,* 1996 WL 33359075 at *2.  Since the bite mark evidence was the only physical evidence

connecting the petitioner to the crime scene at the time of the murder, challenging its admissibility likely would have been a sound decision with no adverse consequence. Although bite mark evidence had been used in other Michigan prosecutions, *see People v. Marsh*, 177 Mich. App. 161, 441 N.W.2d 33 (1989), Dr. Warnick never examined the bite wound himself, and the use of a photograph of the wound to make the comparison appears to be novel. Even if defense counsel could not have anticipated the prosecutor's question soliciting the unsupported statistical evidence, one might expect that lodging a contemporaneous objection and moving to strike the evidence, or perhaps for a mistrial, would be standard operating procedure for a competent defense lawyer.

The flaw in Dr. Warnick's statistical opinion should have been obvious and its admissibility readily assailable. The opinion apparently was based on the mathematical product theory, a proposition that long has been condemned and was discredited over thirty-five years ago by the California Supreme Court in the case of *People v. Collins*, 68 Cal. 2d 319, 66 Cal. Rptr. 397, 438 P.2d 33 (1968), a case that has become a classic for law students in basic evidence classes. In that case, a husband and wife, Malcolm and Janet Collins, were prosecuted for second-degree robbery. The main factual issue in the case was the identity of the perpetrators. The victim could not identify the woman who committed the robbery, but another witness observed a girl run out of the alley (the scene of the crime) get into an automobile, and drive away. The woman was white and was accompanied by a black male. The woman was blonde and had a ponytail, and she left the scene in a yellow automobile. The prosecution called a mathematician who testified concerning the individual probability of the occurrence of several events, including a partially yellow automobile (one in ten), a man with a moustache (one in four), a girl with a ponytail (one in ten), a girl with blonde hair (one in three), a black man with a beard (one in ten), and an interracial couple in a car

(one in one thousand).  The mathematics professor then multiplied the probabilities of all of these

occurrences and concluded for the jury there was a one-in-twelve-million chance that any couple

possessed the distinctive characteristics of the defendants, who were a blonde white woman and a

black male.

The California Supreme Court reversed the ensuing conviction because the expert's

testimony was improper.  Of course, the court attacked the premises of the prosecution's theory.  It

criticized the lack of any evidence showing the actual probabilities of the occurrences of any the six

factors.  There was no proof that the characteristics were mutually independent and applying the

product rule in this case was abjectly misleading.  However, the court also expressed conceptual

doubts concerning the technique.  Justice Sullivan, writing for the court, noted:

> Confronted with an equation which purports to yield a numerical index of probable
> guilt, few juries could resist the temptation to accord disproportionate weight to that
> index; only an exceptional juror, and indeed only a defense lawyer schooled in
> mathematics, could successfully keep in mind the fact that the probability computed
> by the prosecution can represent, at best, the likelihood that a random couple would
> share the characteristics testified to by the People's witnesses – not necessarily the
> characteristics of the actual guilty couple.  . . .  Although we make no appraisal of
> the proper applications of mathematical techniques in the proof of facts . . . we have
> strong feelings that such applications, particularly in a criminal case, must be
> critically examined in view of the substantial unfairness to a defendant which may
> result from ill conceived techniques with which the trier of fact is not technically
> equipped to cope.

*Id.* at 330-31, 66 Cal. Reptr. at 504, 438 P.2d at 40.  The overarching criticism of the court

concerning the application of the product rule in that case was stated as follows: "[T]he testimony

as to mathematical probability infected the case with fatal error and distorted the jury's traditional

role of determining guilt or innocence according to long-settled rules.  Mathematics, a veritable

sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not

cast a spell over him."  *Id.* at 320, 66 Cal. Reptr. at 497, 438 P.2d at 33.

-29-

The disapproval of statistical evidence based on the product theory has been a consistent refrain from courts over the years. *See, e.g., Hart v. Sec'y of Health and Human Servs,* 60 Fed. Cl. 598, 606 (2004) (holding based in part on *Collins'* logic that a special master's reliance on probabilistic statistics to find that infant's death from hemophagocytic lymphohistiocystosis (HLH) was not the result of MMR vaccine was arbitrary and capricious); *Buchanan v. State*, 69 P.3d 694, 709, 119 Nev. 201, 201 (2003) (Rose, J.) (concurring) (recognizing *Collins* as a "landmark case" and noting that absent other evidence, statistics alone would have been an deficient basis for finding that asphyxiation and not SIDS cause a child's death); *United States v. Yee*, 134 F.R.D. 161, 211 (N.D. Ohio 1991) (noting "[p]robability testimony was . . . condemned in *Miller v. State*, 240 Ark. 340, 399 S.W.2d 268, 270 (1966), as 'unsubstantiated' and 'speculative' without an adequate foundation, and likewise in *People v. Collins*. . . because the expert was unable to give any basis for his estimate of the frequencies of the allegedly independent events of a biracial couple, where the man had a beard and the girl blond hair with a ponytail, and the couple had departed the scene of a crime in a partially yellow car"); *Pearson v. State*, 811 P.2d 704, 707-708 (Wyo. 1991) (citing *Collins'* to condemn probability "evidence," but permitting mathematical language in argument); *United States v. Gwaltney*, 790 F.2d 1378, 1383 (9th Cir. 1986) (recognizing *Collins'* holding as the standard for assessing probability statistics, but finding *Collins* inapplicable on the facts); *Davis v. State*, 476 N.E.2d 127, 134 (Ind. App. 1985) (citing *Collins* and holding that probability evidence inadmissible unless it is based on "empirical scientific data"); *People v. Harbold*, 124 Ill. App.3d 363, 79 Ill. Dec. 830, 845, 464 N.E.2d 734, 749 (1984) (testimony based on blood marker frequencies excludable); *United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515, 518 (7th Cir. 1982) (expressing reservations about probability estimates as cautioned in *Collins* due to the

-30-

possibility of prejudice by misleading or confusing the jury); *Commonwealth v. Drayton*, 386 Mass. 39, 434 N.E.2d 997, 1005 (1982) (error to admit testimony of fingerprint being one out of 387 trillion); *State v. Carlson*, 267 N.W.2d 170, 176 (Minn. 1978) (probability estimate excluded regarding blood markers). The basis for objecting to this damaging yet unsubstantiated opinion evidence should have been obvious to defense counsel, and the failure to lodge the objection was substandard performance under prevailing professional norms. The State court's contrary conclusion, to the extent such a conclusion can be inferred from the trial judge's opinions, is an unreasonable application of the governing principles of *Strickland* and *Wiggins*.

ii.

Substandard performance does not amount to a Sixth Amendment violation that will constitute "cause" excusing a procedural default unless the petitioner was prejudiced by her attorney's conduct. In *Strickland*, the Supreme Court made clear that to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Campbell v. United States*, 364 F.3d 727, 730, 736 (6th Cir. 2004). In assessing prejudice, the court must reassess the incriminating evidence against the totality of available mitigating evidence. *Wiggins*, 539 U.S. at 534; *see also Kinnard v. United States*, 313 F.3d 933, 935 (6th Cir. 2002) (holding that "[t]o determine if the defendant was prejudiced by his attorney's performance, it is necessary to determine if the proceeding was fundamentally unfair or unreliable; a court should not focus the analysis on the outcome"); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (observing that

-31-

"an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective").

Under *Strickland* then, the petitioner must show a "reasonable probability" that, but for her counsel's unprofessional errors, a different result likely would have occurred. *Strickland,* 466 U.S. at 694. She does not have to establish that her state trial counsel's deficient conduct "more likely than not altered the outcome in the case." *Id.* at 693. The "reasonable probability" explicated by *Strickland*, rather, is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The question, in other words, is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was 'reliable' – 'whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial . . . cannot be relied on as having produced a just result.'" *Glenn v. Tate*, 71 F.3d 1204, 1210-11 (6th Cir. 1995) (quoting *Strickland*, 466 U.S. at 686).

The state courts noted that evidence of the petitioner's animosity toward the victim and her desire to see the victim killed was "considerable." *People v. Ege,* 1996 WL 33359075 at *1 n.1. The State trial judge found that the evidence "overwhelmingly pointed to the [petitioner's] guilt." *People v. Ege*, Oakland County Circuit Case No. 93-125655-FC, Opinion (January 11, 2000) at 6. The state court of appeals did not share that view on direct appeal, and the trial record contains no evidence that places the petitioner at the victim's house at the time of the murder except for Dr. Warnick's testimony.

There are several reasons that Dr. Warnick's improperly-admitted (occasioned by defense counsel's failure to object) testimony prejudiced the petitioner. Although the defense attempted to rebut Dr. Warnick's testimony with the testimony of other experts who opined that the mark on the

-32-

victim's cheek was the result of *livor mortis* and was not a bite mark at all, the defense experts were not questioned about Dr. Warnick's probability testimony. In addition, Dr. Warnick examined the victim's corpse, which had been exhumed about nine years after her murder, but the body was too decomposed to examine the cheek tissues at that time. Dr. Warnick acknowledged that his opinion was formed solely from carefully examining an autopsy photograph of the victim, which had not been taken for the purpose of a bite mark examination and that, therefore, his opinion was less reliable that an opinion formed on the basis of a direct examination of the body soon after death, or from a photograph taken expressly for forensic dental purposes. However, defense counsel did not cross-examine Dr. Warnick directly about his opinion in statistical or probability terms.

Cross-examination may not have dispelled the injurious effect of the misleading mathematical testimony in any event, since it likely would not have shed light on the "ill conceived techniques with which the trier of fact is not technically equipped to cope." *Collins*, 68 Cal.2d at 332, 66 Cal. Rptr. at 505, 438 P.2d at 41. As the Minnesota Supreme Court stated explained:

> Diligent cross-examination may in some cases minimize statistical manipulation and confine the scope of probability testimony. We are not convinced, however, that such rebuttal would dispel the psychological impact of the suggestion of mathematical precision, and we share the concern for "the substantial unfairness to a defendant which may result from ill conceived techniques with which the trier of fact is not technically equipped to cope."

*People v. Carlson*, 267 N.W.2d 170, 176 (Minn. 1978) (citing *Collins*, 68 Cal.2d at 332, 66 Cal. Rptr. at 505, 438 P.2d at 41).

In this case, Dr. Warnick's unfounded opinion asserted that the petitioner was the only possible perpetrator in the entire Detroit metropolitan area. Such "testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established 'beyond a

reasonable doubt.' *See* Tribe, *Trial by Mathematics*, 84 Harv. L. Rev. 1329." *Carlson*, 267 N.W.2d at 176. Additionally, although bite mark identification evidence is much less scientifically reliable than many other types of physical or scientific evidence, if believed it is highly probative of guilt. A vintage law review article has explained the danger of using bite mark evidence in these terms:

> Bite mark evidence is more persuasive on the ultimate issue of guilt than other analogous forms of evidence. For example, fingerprints tend to be circumstantial or associative; that is, they rarely decide a case alone, but tend to link a defendant to the scene of the crime or an object involved in the crime. By contrast, bite marks, in the usual case, will be conclusive of the guilt issue: the logical distance between the fact of biting and the ultimate issue of guilt is short. Thus, admission of irrelevant bite mark evidence may be particularly prejudicial to the defendant.

Hale, A., *The Admissibility of Bite Mark Evidence*, 51 S. Cal. L. Rev. 309, 326 (1978).

Admission of the bite mark evidence and statistical opinion occurred in the petitioner's trial because trial counsel failed to object to its admission. The failure to object and challenge the evidence was substandard performance that resulted in prejudice within the meaning of *Strickland*. The Court concludes that the petitioner has established cause – constitutionally ineffective assistance of counsel – for the failure to adhere to the State's procedural rules.

b.

Besides cause, the petitioner must also show that he was actually prejudiced as a result of the claimed constitutional error. *United States v. Frady*, 456 U.S. at 170; *Perkins v. LeCureux,* 58 F.3d 214, 219 (6th Cir. 1995). The question of prejudice under the cause-and-prejudice standard is slightly different from the analysis of prejudice for ineffective assistance of counsel purposes, because "in analyzing a petitioner's contention of prejudice [to excuse a procedural default], the court should assume that the petitioner has stated a meritorious constitutional claim." *Moore v. Carlton*, 74 F.3d 689, 691 (6th Cir. 1996) (citing *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir.

-34-

1986)).  The prejudice must have worked to the defendant's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady,* 456 U.S. at 170. If there is strong evidence of a petitioner's guilt and a lack of evidence for his claim, the actual prejudice requirement is not satisfied. *Frady*, 456 U.S. at 172; *Perkins*, 58 F.3d at 219-20; *Rust*, 17 F.3d at 161-62.  There is no prejudice where the petitioner does not show a reasonable probability of a different verdict.  *Mason*, 320 F.3d at 629.

Assuming that the admission of the bite mark evidence and Dr. Warnick's opinion testimony amounted to constitutional error, the finding of prejudice for this purpose is easily made.  Since the bite mark evidence was the only physical evidence tying the petitioner to the crime, its erroneous admission put the petitioner at an actual and substantial disadvantage.  Moreover, as noted above, Dr. Warnick's opinion that the petitioner was the *only* person in the entire Detroit metropolitan area who could have made the mark on the corpse carried an aura of mathematical precision pointing overwhelmingly to the statistical probability of guilt, when the evidence deserved no such credence. The petitioner offered evidence in this Court that a juror would not have voted to convict without the bite mark evidence.  *See* Aff. of Rod Hansen at ¶ 5.  The admissibility of such evidence is questionable, *see* Fed. R. Evid. 606(b), but even without the affidavit, the Court readily finds that the petitioner was actually prejudiced by the evidence.

Because the petitioner has demonstrated both cause and actual prejudice flowing from her attorney's failure to lodge a contemporaneous objection or otherwise challenge the bite mark evidence, the petitioner is excused from her noncompliance with the State's procedural rules.

2.

-35-

Turning to the merits of the claim that admission of the bite mark evidence and opinion testimony violated the petitioner's right under the Due Process Clause to a fair trial, the Court finds that the evidence, already found by the State trial judge to be improperly admitted, "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. The damaging effect of this evidence has been discussed in detail above. There can be no question that the bite mark evidence together with Dr. Warnick's 3.5-million-to-one odds making was powerful evidence against the petitioner. It also contradicted her claim that other logical suspects committed the crime. The evidence plainly was "material in the sense of a crucial, critical highly significant factor."' *Brown*, 227 F.3d at 645 (quoting *Leverett*, 877 F.2d at 925).

There was evidence presented at the trial that the petitioner harbored intense animosity against the victim and expressed a desire to see her killed. That evidence was also challenged and many of the witnesses who gave that testimony were impeached. Some even were the logical suspects themselves, as the State court of appeals observed. However, without the bite mark and opinion testimony, the nature of the State's proofs would have been altogether different and a weaker case necessarily would have resulted with no physical evidence connecting the petitioner to the crime.

Dr. Warnick's evidence was unreliable and grossly misleading. The evidence was "so extremely unfair that its admission violates fundamental concepts of justice." *Dowling v. United States*, 493 U.S. 342, 352 (1990). The crime in this case was brutal, but, as the court of appeals has noted in the past, "it is in just these circumstances, when the crime itself is likely to inflame the passions of jurors, that courts must be vigilant in ensuring that the demands of due process are met." *McKenzie v. Smith*, 326 F.3d 721, 727-28 (6th Cir. 2003). The Court harbors "grave doubt" about

the soundness of the verdict in this case because it is convinced that the erroneous admission of the evidence had "a substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 445.  The State court's conclusions to the contrary were an unreasonable application of federal law established by the Supreme Court in *Brecht v. Abrahamson* and *O'Neal v. McAninch*.  For these reasons, a conditional writ of habeas corpus shall issue.

B.

The petitioner also makes an independent claim of ineffecive assistance of trial counsel.  As noted above, to warrant habeas relief, the petitioner must show that her attorney's performance at trial was deficient and that the deficient performance caused her actual prejudice. *Strickland*, 466 U.S. at 687.  The Court already has made an assessment of the performance prong of the test when it evaluated the issue ineffective assistance of counsel as "cause" for the procedural default.  The Court also has evaluated the question of prejudice in three instances: as a component of the ineffective assistance claim as establishing "cause" for the procedural default; to determine whether the second part of the cause-and-prejudice test was satisfied; and in deciding whether admission of the unchallenged evidence amounted to a due process violation.

A finding of prejudice in the second instance, above, will not suffice to establish the second prong of the *Strickland* test for the petitioner's separate Sixth Amendment claim.  Because a constitutional claim is assumed when the court analyzes whether the petitioner was actually prejudiced for purposes of the cause and prejudice test, a petitioner who satisfies this test is not relieved of her burden to demonstrate prejudice with respect to her underlying claim of ineffective assistance of counsel. *Moore*, 74 F.3d at 692.  Thus, if a petitioner successfully relies on ineffective assistance of counsel to establish cause and prejudice to excuse her procedural default or abuse of

-37-

the writ, she must still demonstrate deficient performance of counsel and prejudice in order to win on her underlying claim of ineffective assistance of counsel. *Ibid.*

However, the Court is satisfied that prejudice has been established for the purpose of the petitioner's free-standing ineffective assistance of counsel claim. The finding of prejudice as part of the due process claim largely parallels the required finding under prong two of *Strickland*, and the Court is convinced of the "reasonable probability" that but for the defective performance, which resulted in the receipt of the bite mark evidence and the statistical probability testimony, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As noted, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* The Court is not convinced that the trial, which included Dr. Warnick's testimony, produced a just result.

The Court finds, therefore, that the petitioner is entitled to relief on this ground as well.

## C.

Finally, the petitioner claims that she is entitled to a writ of habeas corpus because the prosecutor questioned her about previous sexual encounters with certain prosecution witness and asked her about pregnancies she aborted where the prosecution witnesses were the presumed fathers. As a corollary, the petitioner contends that counsel, who represented the petitioner at trial and on appeal, was ineffective for failing to object to these questions at trial and failing to present these claims in her appeal of right.

Improper questioning by a prosecutor warrants habeas relief only if it deprives the petitioner of a fundamentally fair trial. *Stumbo v. Seabold*, 740 F.2d 910, 911 (6th Cir. 1983) (citing *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979)). The State court of appeals addressed this issue on

direct review and found it lacking in merit. *People v. Ege,* 1996 WL 33359075 at *18-*22. This Court's review of the record confirms that the decision was not an unreasonable application of federal law.

Several witnesses testified that the petitioner expressed great hatred for the victim, attacked her once at her home, plotted her murder, predicted the form of her murder, and tried to hire others to commit the murder. In light of this testimony regarding the petitioner's motive, intent, and efforts to have the victim murdered, testimony about the petitioner's sexual history and past abortions is unlikely to have influenced the jury. Moreover, the defense argued that various male prosecution witnesses were not credible because they were disgruntled former boyfriends of the petitioner, including two men who may have impregnated the petitioner prior to the two abortions in question. Consequently, testimony regarding these facts may have supported the petitioner's attack on the witnesses' credibility. Therefore, this line of prosecutorial questioning and the petitioner's answers did not deny her a fair trial.

For the same reason, and contrary to the petitioner's alternate argument, failing to object to these questions does not give rise to an ineffective assistance of trial counsel claim. There is no reasonable probability that, but for counsel's failure to object to these questions, the outcome of the petitioner's trial would have been different. Consequently, the petitioner cannot establish that she was prejudiced by this alleged error. *Strickland*, 466 U.S. at 694. As noted by the trial court, this questioning and the petitioner's replies may well have bolstered her challenge to the credibility of these witnesses. Trial counsel, therefore, had a sound tactical reason not to object to these questions. Failure to present a meritless claim on appeal is not ineffective assistance of appellate counsel. The petitioner therefore is not entitled to habeas relief on her final claims.

III.

The Court finds that the improper admission of Dr. Warnick's expert opinion at trial resulted in fundamentally unfair trial, and counsel rendered ineffective assistance in failing to object to the admission of that evidence. The Michigan court's decision to the contrary was an unreasonable application of federal law as established by the Supreme Court. The petitioner, therefore, has established that she is in custody in violation of her federal constitutional rights. *See* 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is conditionally **GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings her to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 22, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 22, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS